1  **DOUGLAS C. KANE, S.B. NO. 198934**
   **LAW OFFICE OF DOUGLAS KANE**
2  **121 Jewell Street**
   **Santa Cruz, CA 95060**
3  **(831) 459-8000**

4

5  **Attorney for Plaintiff KEVIN HALPERN**

6

7

8              **UNITED STATES DISTRICT COURT**

9      **FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

10

11  **KEVIN HALPERN,**                    **CASE NO. C 02-05557 JW/RS**

12       **Plaintiff,**                   **PLAINTIFF'S MEMORANDUM OF**
                                          **POINTS AND AUTHORITIES IN**
13       **v.**                           **OPPOSITION TO DEFENDANTS'**
                                          **MOTION FOR SUMMARY**
14  **CITY OF SANTA CRUZ, ABRAHAM**       **JUDGMENT OR IN THE**
    **RODRIGUEZ, DAVID PERRY, and**       **ALTERNATIVE, FOR SUMMARY**
15  **DOES 1 through 20, inclusive,**     **ADJUDICATION**

16       **Defendants.**                  **Date: March 22, 2004**
                                          **Time: 8:30 a.m.**
17                                        **Dept.: 8**

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**SECTION**                                                        **PAGE NO.**

3

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

4

**I.**     **INTRODUCTION AND SUMMARY OF ARGUMENT.** . . . . . . . . . . . . . . . . . . . 1

5

**II.**    **STATEMENT OF FACTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6

**III.**   **ARGUMENT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

7

       **A.**     **Summary Judgment Standards.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

8

       **B.**     **There Are Triable Issues As to Whether the Officer's Violated**
             **Plaintiff's Constitutional Rights.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

9

10

             **1.**     **There are triable issues of fact as to whether the officers**
                 **had reasonable suspicion to justify detaining Plaintiff**
                 **and/or probable cause to arrest Plaintiff.** . . . . . . . . . . . . . . . 17

11

12

                   **a.**     **Reasonable suspicion.** . . . . . . . . . . . . . . . . . . . . . . . . . 17

                   **b.**     **Probable Cause** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

13

             **2.**     **There are triable issues as to whether the officers used**
                 **excessive force in handcuffing plaintiff** . . . . . . . . . . . . . . . . 21

14

       **C.**     **There Are Triable Issues of Fact as to Whether the Officers Are**
             **Entitled to Qualified Immunity.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15

16

       **D.**     **There Are Triable Issues of Fact as to Whether the City is Liable**
             **Pursuant to Monell** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

17

       **E.**     **There Are Triable Issues As to Plaintiff's State Law Claims.** . . . . . . 24

18

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT CASES                    PAGE NO.

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242, 106 S.Ct. 2205 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

*Beck v. Ohio,*
    379 U.S.89, 85 S.Ct. 223   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Celotex Corp. v. Catrett*
    477 U.S. 317, 106 S.Ct. 2548 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Davis v. Scherer,*
    468 U.S. 183, 104 S.Ct 3012 (1984)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Eastman Kodak Co. v. Image Technical Services, Inc.*
    504 U.S. 451, 112 S.Ct. 2072 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Graham v. Connor,*
    490 U.S. 386 (1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*Monroe v. Pape,*
    365 U.S. 167, 81 S.Ct. 473 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*United States v. Arvizu,*
    534 U.S. 266, 273-274 (2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*Westfall v. Erwin*
    484 U.S. 292, 108 S.Ct. 580 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16


## FEDERAL CASES                                          PAGE NO.

*Act Up!/Portland v. Bagley,*
    988 F.2d 868 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

*BeVier v. Hucal,*
    806 F.2d 123, 128 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*British Airways Board v. Boeing Co.*
    585 F.2d 946, 951 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Bryant v. Hall*
    238 F.2d 783 (5th Cir. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

*Caballero v. City of Concord,*
    956 F.2d 204 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Fields v. City of Omaha,*
    810 F.2d 830 (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Headwaters Forest Defense v. County of Humboldt,*
    211 F.3d 1121, 1141 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

# TABLE OF AUTHORITIES (cont.)

**FEDERAL CASES (cont.)** **PAGE NO.**

*Katz v. United States,*
194 F.3d 962, 969 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Kuehl v. Burtis,*
173 F.3d 646 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22-23

*Lalonde v. County of Riverside,*
204 F.3d 947 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24

*McKenzie v. Lamb,*
738 F.2d 1005, 1008 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Montgomery v. DeSimone,*
159 F.3d 120 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Moreland v. Las Vegas Police,*
159 F.3d. 365 (9th Cir 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

*Nationwide Life Insurance Company v. Bankers Leasing Association, Inc.*
182 F.3d 157, 160 (2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Nunez v. Superior Oil Co.*
572 F2d 1119 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

*Ramero v. Kitsap County*
931 F.2d 624, 627 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Robinson v. Solano County,*
218 F.3d 1030 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

*Sevigny v. Dicksey,*
846 F.2d 953 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

*Tillman v. Coley*
886 F.2d 317 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*United States v. One Tintoretto Painting*
691 F.2d 603 (2nd Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

*United States v. Tiong,*
224 F.3d 1136 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*Washington v. Lambert,*
98 F.3d 1181 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

1

## TABLE OF AUTHORITIES (cont.)

2

**CALIFORNIA CASES**                                                    **PAGE NO.**

3

*Boyes v. Evans*
    14 Cal.App. 2d. 472 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

4

*Iverson v. Atlas Pacific Engineering*,
    143 Cal.App.3d 219 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

5

6

**CONSTITUTIONAL AUTHORITY**                                           **PAGE NO.**

7

United States Constitution
    Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 21

8

    Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

9

**STATUTORY LAW**                                                      **PAGE NO.**

10

29 U.S.C.
    § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18, 24

11

12

California Penal Code
    815.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

13

    847 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

14

**FEDERAL RULES**                                                      **PAGE NO.**

15

Federal Rules of Civil Procedure
    Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

16

17

**OTHER AUTHORITY**                                                    **PAGE NO.**

18

Schwarzer, Hirsh & Barrans, *"The Analysis and Decision of Summary Judgment Motions"*
    139 FRD 441 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

19

20

Schwarzer, Tashima & Wagstaffe, CA. PRAC. GUIDE: FED CIV. PRO. BEFORE TRIAL (The Rutter Group 2000)
    § 14:31, p. 14-10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

21

    § 14:224, p. 14-61     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

22

23

24

25

26

27

28

1    **I.    INTRODUCTION AND SUMMARY OF ARGUMENT.**

2           Plaintiff was arrested, handcuffed, and paraded through a very public place like a

3    common criminal, even though there was no real objective evidence that he had

4    committed any kind of a crime.  Moreover, despite the fact that it is undisputed that

5    plaintiff posed no threat to either the officers or anyone else, they used so much force in

6    handcuffing plaintiff and otherwise detaining him that they caused a major and possibly

7    permanent injury to him.  Thus, defendants clearly violated plaintiff's constitutional and

8    California state law rights by unlawfully arresting him and using force far in excess of that

9    necessary.

10          Defendants completely fail to provide any relevant authority at all in support of their

11   contention that plaintiff's claim that defendants Rodriguez and Perry violated his

12   constitutional rights under the Fourth and Fourteenth Amendments of the United States

13   constitution by arresting him without probable cause that he had committed a crime.  The

14   California state law criminal cases that defendants cite are not only factually

15   distinguishable, they are completely inapplicable to the question of whether a federal civil

16   claim under 42 U.S.C. section 1983 for arrest without probable cause.  Unlike criminal

17   cases, in which the court determines the questions of whether probable cause existed, in

18   section 1983 cases the question of whether probable cause existed is generally a

19   question of fact for the jury to determine, unless only one conclusion could possibly be

20   reached.  Here, there is abundant evidence to support the conclusion that plaintiff was

21   arrested without probable cause.

22          Indeed, it is the opinion of D.P. Van Blaricom, a former police chief with 29 years

23   of continuous police service who has testified in over a thousand cases throughout the

24   United States, that not only was there not probable cause to arrest plaintiff, there was

25   not even reasonable suspicion to detain him.  This opinion is based primarily on the facts

26   that: the officers complete failure to ask any clarifying questions or check-out plaintiff's

27   explanation of his presence because "criminals will lie to officers"; the officers failed to

28   apply the first three steps of the Drug Abuse Recognition (DAR) 7-Step Process that they

were relying upon; at the time of plaintiffs arrest, the critical observations of the officers were inconsistent with each other but these inconsistencies were never discussed between Officer Perry, who was acting as Field Training Officer, and his trainee, Officer Rodriguez, who was making only his second such arrest; and that approximately 20 minutes later, their further observations were completely inconsistent with those upon which they had relied to arrest plaintiff.  In Mr. Van Blaricom's opinion, plaintiff's arrest was most likely a "training exercise" to address Officer Perry's concern about his trainee's failure to "see things through."

Not only are there are triable issues as to whether the officers violated plaintiff's constitutional rights, there are also triable issues as to whether they are entitled to qualified immunity.  There are also triable issues of fact as to whether the City of Santa Cruz's policy not to have drug recognition experts available to examine drug abuse suspects in the field caused the unconstitutional arrest without probable cause of plaintiff.  Finally, there are triable issues of fact as to each of plaintiff's state law claims.

## II.   STATEMENT OF FACTS.

Plaintiff is a 28-year-old white male.  Other than the incident that serves the basis for this claim, he has never been arrested.  He is a graduate of an Ivy League university and has never been involved in any way with any kind of substance abuse. (Halpern Declaration, ¶ 2.)

Early in the morning on January 8, 2002, Plaintiff was scheduled to leave on a flight to New York from San Jose International Airport, so he could visit his family there. A friend of his who was going to drive him to the airport was to pick him up at his girlfriend's house.  Unfortunately, Plaintiff's girlfriend decided to break up with him at this time.  Plaintiff therefore tried to contact his friend who was going to drive him to the airport on his friend's cell phone, but the friend did not answer the phone.  After several attempts to call him, Plaintiff and his ex-girlfriend agreed that Plaintiff should start walking towards his friend's house because she wanted to go to sleep.  After the Plaintiff

1  left, because of the cold weather, Plaintiff jogged occasionally, but had a backpack with

2  contents that included three heavy communication technology books that prevented him

3  from jogging the full way to his friend's house. Therefore, his temperature and pulse

4  were somewhat elevated. Plaintiff reached the gas station at the corner of Soquel and

5  Frederick and again called his friend. (Halpern Declaration, ¶ 3.)

6      Defendant Abraham Rodriguez ("Rodriguez") saw Plaintiff waiting at the

7  intersection at approximately 1:28 a.m. on January 8, 2002, and pulled his patrol car into

8  the Beacon gas station to investigate. (Police Report, Rodriguez Narrative[1], p. 1.)

9  Officer David Perry ("Perry") was acting as Rodriguez's field training officer. (Perry

10  Deposition[2], p. 34, l. 24 - p. 35, l. 4.) His biggest concern about Rodriguez as a trainee

11  was that "sometimes he wouldn't see things through. My big thing it to see things to a

12  conclusion ... ." (Perry Deposition, p. 36, ll. 1-10.)

13      When the two officers got out of the patrol car and started heading towards him,

14  Plaintiff approached the first officer (Rodriguez) to explain why he was waiting at the

15  intersection. He also informed the officer that he was upset because his girlfriend had

16  just broken up with him. (Halpern Declaration ¶ 4.) Rodriguez observed that plaintiff was

17  "slightly sweating" and that plaintiff's skin temperature was "slightly warmer" then his

18  own. (Police Report, Rodriguez Narrative, p. 1.)

19      Despite plaintiff's explanation, Rodriguez continued to detain Plaintiff. He

20  conducted a search for weapons, and found nothing. He then requested that Plaintiff

21  consent to a search of his backpack. Having nothing to hide, Plaintiff agreed. No

22  weapons or contraband were found.(Halpern Declaration, ¶ 5.) Rodriguez Deposition[3], p.

23  58, ll. 3-15.)

24  _____

25  [1]  A copy of the Rodriguez and Perry's police report is attached to the declaration of Douglas C.
Kane as Exhibit A. Rodriguez's narrative report is referred to hereafter as "Police Report,
26  Rodriguez Narrative." Perry's Supplemental Report is referred to hereafter as "Police Report,
Perry's Supplemental Report."

27  [2]  Relevant excerpts from the transcript of Perry's deposition are attached to the declaration of
Douglas C. Kane at Exhibit B.

28  [3]  Relevant excerpts from the transcript of Rodriguez's deposition are attached to the declaration of
Douglas C. Kane at Exhibit C.

1    Rodriguez nonetheless still continued to detain Plaintiff, purportedly to determine

2    whether Plaintiff was under the influence of a controlled substance.  He did not ask

3    Plaintiff any questions as to why his pulse and temperature might be slightly raised.  He

4    did not ask plaintiff any questions about his girlfriend and he breaking up, or why plaintiff

5    might seem agitated or upset. He did not ask plaintiff why he was "flailing my arms" or

6    why he was not wearing a heavy jacket.  He never told plaintiff that he did not have to

7    agree to a search, or that plaintiff was free to leave. (Halpern Declaration, ¶ 5.)  Plaintiff

8    did not threaten him in any way.  (Rodriguez Deposition, p.  59, l. 10 - p. 60, l. 16.)

9    Rodriguez believed that he had reasonable suspicion that plaintiff had committed,

10   was committing or was about to commit a crime based on the facts that he was out at

11   1:30 in the morning, in the extreme cold, flailing his arms around and being in a agitated

12   state.  (Rodriguez Deposition, p.  112, l. 24 - p. 113, l. 7.)

13   One of the factors that let him to his initial determination that plaintiff was under the

14   influence was that plaintiff  was acting agitated. (Rodriguez Deposition, p.  103, ll. 14-21.)

15   However, he indicated in his police report that plaintiff told him that he was a little

16   agitated because his girlfriend "dumped him."  (Police Report, Rodriguez Narrative, p. 1.)

17   Rodriguez can not say whether it would be unusual for someone to be agitated after

18   being "dumped" by their girlfriend. (Rodriguez Deposition, p.  99, l. 1 - p. 100, l. 22.)  He

19   does not know whether or not he asked why plaintiff was agitated. He does not know

20   whether that would have been an important piece of information for him to have in

21   determining whether there was a violation of a crime, but his report does not indicate that

22   he asked plaintiff this. (Rodriguez Deposition, p.  100, l. 23 - p. 102, l. 17; Police Report,

23   Rodriguez Narrative.)  He can not recall if he asked anything else about plaintiff's

24   girlfriend "dumping him".  His police report does not report that he did.  He did not

25   contact plaintiff's girlfriend (Rodriguez Deposition, p.  102, ll. 21-25; Police Report,

26   Rodriguez Narrative.)  He does not recall whether he asked plaintiff if he had her

27   telephone number.  His police report does report that he did. (Rodriguez Deposition, p.

28   103, ll. 11-13; Police Report, Rodriguez Narrative.)

1    Rodriguez did not follow up on this because "the practice is criminals will lie to

2    officers. " (Rodriguez Deposition, p. 103, ll. 1-5.)

3         It seemed odd to Rodriguez that plaintiff was standing out on the corner at 1:30 in

4    the morning in extreme cold flailing his arms, wearing a T-shirt, and carrying a backpack.

5    So he decided to talk to plaintiff to investigate him for possible criminal activity.

6    (Rodriguez Deposition, p. 109, ll. 8-20.) However, he does not recall if he asked why

7    plaintiff was "flailing his arms." His report does not indicate that he did. (Rodriguez

8    Deposition, p. 104, ll. 5-10; Police Report, Rodriguez Narrative.)  He does not recall if he

9    asked plaintiff why he was only wearing a T-shirt[4].  His report does not indicate that he

10   did.  (Rodriguez Deposition, p. 104, l. 21 - p. 105, l. 22; Police Report, Rodriguez

11   Narrative.)  He does not recall if he asked plaintiff why he was waiting at the corner.  His

12   report does not indicate that he did. (Rodriguez Deposition, p. 107, ll. 6-15; Police

13   Report, Rodriguez Narrative.)

14        Plaintiff's actions that caught Perry's attention was that "he was flailing his arms

15   about, standing on the corner, just wearing a T-shirt. ... The behavior, if anything, was

16   bizarre and needed to be addressed." (Perry Deposition, p. 37, ll. 2-6.)  However, he did

17   not specifically hear Rodriguez ask plaintiff what he was doing there. (Perry Deposition,

18   p. 40, ll. 5-11.) Perry considered plaintiff to be threatening because his actions were

19   bizarre or erratic.  He tells his trainees "you don't know these people on the street."  He

20   thinks "bizarre behavior" is threatening because "you don't know where this individual's

21   coming from."  The "bizarre" behavior that he observed was that plaintiff was "flailing his

22   arms" the fact that he was on the street corner at approximately 1:30 a.m., that he was

23   wearing a T-shirt and it was extremely cold, and that his demeanor fluctuated from

24   agitation to amusement, and his slightly sweating body. (Perry Deposition, p. 46, l. 23 - p.

25   49, l. 23.)

26        Perry never asked plaintiff why he was agitated, and so far as he is aware, neither

27

28        [4]        Actually, plaintiff was wearing a sweatshirt with a hood (see picture of plaintiff taken by defendants,
                    attached to the Declaration of Douglas C. Kane at Exhibit D.

1   did Rodriguez. Perry did not see the need to do so.  It might have mattered why he was

2   agitated, but at the time he did not thing about or nobody got around to asking him.

3   (Perry Deposition, p. 91, l. 12 - p. 92, l. 11.)  He thought it was bizarre that plaintiff was

4   "flailing his arms" when it was extremely cold because he did not know why plaintiff was

5   doing that.  But he did not ask plaintiff why he was "flailing his arms" or what he was

6   doing, nor did he hear Rodriguez do so.  They did not ask questions to determine why he

7   was engaging in the behavior that they thought was bizarre because "the observations

8   are based on the observations and not the questions." (Perry Deposition, p. 92, l. 12 - p.

9   94, l. 7.)  He did not ask plaintiff why he was waiting at the that corner.  He has no idea

10  whether Rodriguez did so, but Rodriguez's report does not indicate that he did.  (Perry

11  Deposition, p. 96, l. 12 - p. 99, l. 5.)  According to Perry, they did not make any effort to

12  find out whether plaintiff really was dumped by his girlfriend because Perry did not

13  believe that it had any bearing on this type of investigation.  (Perry Deposition, p. 103, l.

14  21 - p. 104, l. 4.)

15      Neither Perry nor Rodriguez told plaintiff that he did not have to talk to them, or

16  that he had to submit to a search of his person, or informed him at any time that he was

17  free to leave.  (Perry Deposition, p. 104, l. 7 - p. 105, l. 23; Rodriguez Deposition, p.  113,

18  ll. 15 - p. 115, l. 5; Police Report, Rodriguez Narrative.)

19      Rodriguez did not have any conversations with Perry before deciding to test

20  plaintiff for being under the influence. (Rodriguez Deposition, p.  58, l. 17 - p. 59, l. 4;

21  Perry Deposition, p. 44, ll. 1-10.)

22      Rodriguez asked plaintiff to tilt his head back and count out loud to 30.  Plaintiff

23  followed his directions and did what Rodriguez asked him to do. At no time was plaintiff's

24  behavior "erratic," nor did his speech "fluctuate." Rodriguez then shined a flashlight into

25  plaintiff's eyes, apparently to measure his pupils, and took his pulse.  (Halpern

26  Declaration, ¶ 6.)  He measured plaintiff's pupils as 7.5 mm and his pulse to be 136

27  beats per minute.  (Police Report, Rodriguez Narrative, p. 2.)

28      Perry also shined a flashlight in plaintiff's eyes. (Halpern Declaration, ¶ 6.) Perry

chose to do a pupil test but not to take plaintiff's pulse because "It's not my job to degrade the officer.  He's never going to learn, and it just sets a bad precedent." (Perry Deposition, p. 51, l. 8 - p. 52, l. 25.) According to Perry, "I've reached the rank of staff sergeant in United States Marine Corps, had a whole platoon of Marines in my command.  I know what supervisors do."  (Perry Deposition, p. 76, ll. 17-19.)

Perry measured plaintiff's pupils at 6.5 mm, without the introduction of artificial lighting.  According to the DAR pupilometer, this is within the "near normal" range. (Perry Deposition, p. 54, ll. 5-25; Police Report, Perry Supplemental Report, p. 2; D.A.R. Seven Step Process[5].)  Despite the fact that he and his trainee, Rodriguez and made different determinations of plaintiff's pupil size (with his determination being with the "near normal" range and Rodriguez's being outside that range) Perry allowed Rodriguez to make the decision to arrest plaintiff. (Perry Deposition, p. 89, l. 8 - p. 90, l. 5.) In fact, Rodriguez did not even tell Perry what his initial observations were out on the street until later when they were in the hospital room. (Perry Deposition, p. 68, ll. 9-12.)

When Rodriguez told Plaintiff he was arresting him, he handcuffed Plaintiff and vigorously frisked him.  Plaintiff complained that Rodriguez was hurting his left wrist. Rodriguez's response was to tighten the handcuffs until they could not move up or down Plaintiff's arms at all.  Many times throughout the rest of this ordeal, Plaintiff explained that the handcuffs were injuring his wrist, and asked that the officers loosen them. These requests were completely ignored; throughout the time plaintiff was detained the handcuffs were never loosened. (Halpern Declaration, ¶ 7.)

The only conversation that Rodriguez had with Perry before arresting plaintiff was informing Perry that he had decided to arrest plaintiff.  (Rodriguez Deposition, p.  66, l. 16 - p. 67, l. 5.)  It was Rodriguez's intention to bring plaintiff to Dominican Hospital in order to conduct a blood an urine test as well as additional evaluation of the tests that he had previously done.  (Rodriguez Deposition, p.  69, ll. 3-7.)  According to Rodriguez, it

---

[5]     A copy of the California Narcotic Officer's Assodation Drug Abuse Recognition Program D.A.R. 7-STEP PROCESS, card used by the officers is attached to the declaration of Douglas C. Kane at Exhibit E.

1   was his decision to go to the hospital.  (Rodriguez Deposition, p.  72, ll. 8-11.)

2        Plaintiff was brought by the officers to Dominican Hospital through the emergency

3   room entrance.  All the people in the emergency room were watching in surprise as

4   Plaintiff was led in, handcuffed.  Several individuals who had worked in the emergency

5   room for many years later told Plaintiff that they had never seen anyone brought in to the

6   emergency room in handcuffs like that. (Halpern Declaration, ¶ 8.)

7        Plaintiff asked that a hospital representative accompany him to observe the

8   treatment he was being accorded.  The officers refused.  They brought him to a room

9   and handcuffed him to the bed.  Despite Plaintiff's complaints about his left wrist, the

10  officers kept one handcuff tightly secured to that wrist, with the other cuff attached to one

11  of the bedposts.  Rodriguez again viewed Plaintiff's pupils.  This time he recorded them

12  as being 6.5 mm, the same size Perry had previously recorded them as.  He also noted

13  that plaintiff's pulse had lowered somewhat to 108 Beats per minute.  (Halpern

14  Declaration, ¶ 9; Police Report, Rodriguez Narrative, p. 3.)

15       Rodriguez does not know if it was lighter or darker then it had been at the street

16  corner in the hospital room. (Rodriguez Deposition, p.  76, ll. 8-10.)  He did not have any

17  conversation with Perry before he conducted the tests in the hospital room.  (Rodriguez

18  Deposition, p.  76, 11-14.)  He did have a conversation with Perry after he conducted his

19  additional tests in the hospital but does not recall the substance, other than that Perry

20  "did have a separate reading."  According to Rodriguez, he  advised Perry and his

21  sergeant that he now believed that plaintiff was not under the influence.  (Rodriguez

22  Deposition, p.  76, l. 24 - p. 77, l. 21.)  However, according to Perry, he recommended to

23  Rodriguez that the evidence did not support the conclusion that Plaintiff was under the

24  influence of a controlled substance, and so Rodriguez released Plaintiff. (Police Report,

25  Perry Supplemental Report, p. 3, Perry Deposition, p. 68, ll. 20-24.)

26       Neither Rodriguez nor Perry are certified or trained as a drug recognition expert.

27  (Rodriguez Deposition, p.  115, ll. 15-18; Perry Deposition, p. 105, l. 22 - p. 106, l. 6.) It is

28  not the policy of the City of Santa Cruz to have drug recognition experts available to

1    examine under the influence suspects in the field.  (Perry Deposition, p. 106, ll. 7-15.)

2         Rodriguez was relying in part on the D.A.R. (Drug Abuse Recognition) Program in

3    developing probable cause for plaintiff's arrest.  (Rodriguez Deposition, p.  117, l. 24 - p.

4    118, l. 5; D.A.R 7-Step Process.)  He was given the card titled "DAR 7-Step Process" as

5    part of his training in the City of Santa Cruz.  It was something that he would carry

6    around when he was out on patrol.  It gives information or what to look for narcotic

7    recognition to see if someone's under the influence.  The back (second page of Exhibit D

8    to the Kane Declaration) gives different tests to use.  (Rodriguez Deposition, p.  33, ll. 1-

9    25.) The DAR 7-step process card was also provided to Perry by the City of Santa Cruz

10   Police Department.  This Drug Abuse Recognition Program is the program that he was

11   trained to use in doing drug recognition.  (Perry Deposition, p. 32, l. 15 - p. 33, l. 6.)

12        The D.A.R. is a 7-step process, but Rodriguez does not believe that it is necessary

13   to do all seven steps. (Rodriguez Deposition, p.  118, ll. 10-15.)  He skipped the first 3

14   steps because he has certain tests that he wanted to do.  He did the tests that he did

15   because he was thinking plaintiff could possibly be under the influence of a stimulant.

16   (Rodriguez Deposition, p.  118, l. 16 - p. 120, l. 17.)  However, at the time that he

17   decided to conduct a series of tests he had not determined that plaintiff was not under

18   the influence of a controlled substance other than a stimulant such as PCP. (Rodriguez

19   Deposition, p.  122, ll. 17-22.)  He used the tests that he was comfortable with.

20   (Rodriguez Deposition, p.  123, ll. 16-18.)  According to Perry, they did not do the first

21   three steps of the DAR Seven step process because, "if an individual is under the

22   influence of a central nervous system stimulant, why would I want to bother with the first

23   three [tests]."  (Perry Deposition, p. 108, l. 18 - p. 109, l. 25.)  Neither he nor Rodriguez is

24   trained in conducting either horizontal gaze nystagmus or vertical gaze nystagmus.

25   (Perry Deposition, p. 107, ll. 5-19.)

26        Perry can not really account for the fact that within 20 minutes of his initial

27   observation of plaintiff, his measurement of plaintiff's pupils went from 6.5 mm to 4.0-4.5

28   mm.  (Perry Deposition, p. 111, l. 19 - p. 112, l. 6.)  He does not think that there was a

1   significant difference in his measurement of plaintiff's pupils during the initial contact as

2   6.5 mm from Rodriguez's measurement at 7.5. mm. (Perry Deposition, p. 113, l. 20 - p.

3   114, l. 11.) He does think that there was a significant difference in his measurement of

4   plaintiff's pupils in the hospital room at 4-4.5 mm from Rodriguez's measurement of 6.5

5   mm. He does not know why they were so different (Perry Deposition, p. 114, l. 12 - p.

6   116, l. 22.) He does not know whether the fact that both on the street corner and in the

7   hospital room Rodriguez observed plaintiff's pupils larger then he observed them was

8   because Rodriguez's observation were simply an error. (Perry Deposition, p. 117, l. 21 -

9   p. 118, l. 8.)

10      Rodriguez accounts for the fact that his recording of plaintiff's pupil size went from

11   7.5 mm to 6.5 mm in 20 minutes to the different lighting conditions, even though he is

12   not sure whether it was lighter or darker then the street corner in the hospital room.

13   (Rodriguez Deposition, p. 124, l. 9 - p. 125, l. 6.) He "doesn't know how [it] is possible"

14   that plaintiff's pulse went from 136 to 108 in less then twenty minutes. (Rodriguez

15   Deposition, p. 125, ll. 7-12.) He accounts for the fact that at the initial contact he

16   measured plaintiff's pupils at 7.5 mm and Perry measured them at 6.5 mm because they

17   "have different perspectives" and Perry "might see it a different way that I do."

18   (Rodriguez Deposition, p. 125, l. 13 - p. 126, l. 5.) He can not account for the fact that in

19   the hospital room he measured plaintiff's pupils at 6.5 mm and Perry measured them at

20   4 to 4.5 mm. (Rodriguez Deposition, p. 126, l. 16 - p. 127, l. 15.)

21      To the best of his recollection, Rodriguez had made one previous arrest using the

22   DAR program. He does not know whether it led to a conviction. (Rodriguez Deposition,

23   p. 123, l. 23 - p. 124, l. 8.)

24      Before they released him, Rodriguez began filling out a Certificate of Release

25   form. At this point, Plaintiff overheard Rodriguez ask Perry for help in filling the form out,

26   stating that he had never filled one out before. (Halpern Declaration, ¶ 10.)

27      After removing the handcuffs, the officers took several pictures of Plaintiff in

28   response to his statement that he was considering legal action in response to their

1   violations of his rights.  Rodriguez told him to smile for the picture, and when Plaintiff

2   failed to do so, Rodriguez moved close to Plaintiff's face and threatened to put the

3   handcuffs on again.  When Plaintiff continued to refuse to smile, Rodriguez grabbed his

4   arm as if to put the handcuffs back on.  Plaintiff then agreed and produced a sickly smile

5   for the picture. (Halpern Declaration, ¶ 11; picture of plaintiff.)

6       Rodriguez does not recall how many times plaintiff was allegedly "pulling" on the

7   handcuffs, other then that it was more then two.  It might have been more then a

8   hundred times.  As far as he can recall, he did not do anything to stop plaintiff for doing

9   so.  (Rodriguez Deposition, p.  79, l 10 - p. 81, l. 5.)  Perry also did not do anything to

10  stop plaintiff from pulling on the handcuffs.  (Perry Deposition, p. 78, l. 7 - p. 79, l. 4.)

11      After the officers released him, Plaintiff stayed at Dominican Hospital in order to

12  proceed with the blood and urine examinations.  The tests came out negative for all

13  controlled substances, as well as alcohol.  (Halpern Declaration, ¶ 12, Exhibit A.)

14      Plaintiff's unlawful detention caused him significant embarrassment, mental

15  anguish, and emotional distress.  He has been diagnosed with post traumatic stress

16  disorder and depression as a result of this incident and is undergoing therapy in order to

17  cope with these disorders.  (Halpern Declaration, ¶ 13.)

18      The officers' use of excessive force has caused significant injury to Plaintiff's left

19  wrist.  He has been diagnosed with left wrist extensor tenosynovitis as a result of the

20  handcuffs being tightened so severely.  This injury continues to cause Plaintiff

21  considerable pain and makes it difficult for Plaintiff to do common tasks such as writing,

22  driving, typing, turning door knobs, opening jars, eating, etc., as well as preventing him

23  from enjoying activities such as rock climbing, weight lifting and mountain biking.

24  (Halpern Declaration, ¶ 14.)

25      There was a citizen complaint made against Rodriguez in the second half of 2003

26  for a false arrest where he arrested someone for being drunk in public. (Rodriguez

27  Deposition, p.  95, l. 13 - p. 96, l. 16.)  Perry has had five, six, maybe seven citizen

28  complaints made against him.  He has not given it a lot of thought, because "I'm not out

1    there doing things wrong, at least in my personal and professional opinion." The only

2    one that he recalls is that a citizen complained that his presence was intimidating and

3    the citizen felt threatened. (Perry Deposition, p. 85, l. 7 - p. 87, l. 19.)

4          D. P. Van Blaricom had a law enforcement career that spanned twenty-nine years

5    of continuous police service; he was the Chief of Police for the City of Bellevue,

6    Washington for eleven of those years. (Van Blaricom Affidavit, ¶ 2; see Exhibit A to that

7    Affidavit for a detailed statement of his qualifications.) His areas of expertise in the police

8    arts and sciences include, but are not limited to: police use of force; police

9    administration, policies, practices, procedures and standards of care; civil rights

10   violations; internal investigation and discipline.   He has testified in state and federal

11   courts for both plaintiffs and defense throughout the United States. (Van Blaricom

12   Affidavit, ¶ 2, Exhibit A.)

13         Mr. Van Blaricom was retained to review the facts and circumstances of plaintiff's

14   arrest by Officers Abraham Rodriguez and David Perry on January 8, 2002.  Among the

15   documents that he reviewed were the police reports of Rodriguez and Perry, the D.A.R.

16   7-Step Process, Responses to Interrogatories by the City of Santa Cruz and Officers

17   Rodriguez and Perry, and the transcripts of the depositions of Officers Perry and

18   Rodriguez. (Van Blaricom Affidavit, ¶ 3.)  It is Mr. Van Blaricom's customary practice to

19   evaluate the objective reasonableness of police conduct on a case-by-case basis from

20   the perspective of a police reviewing authority. (Van Blaricom Affidavit, ¶ 4.)

21         It is Mr. Van Blaricom's opinion that there was not reasonable suspicion to detain

22   plaintiff.  In reaching that conclusion he considered the following factors:

23         a.      Plaintiff was standing on a well lighted corner waiting for a ride;

24         b.      Plaintiff was observed to be wearing a t-shirt and *"flailing his arms"* on an

25                 *"extremely cold"* night;

26         c.      Plaintiff made no effort to elude the officers and voluntarily approached

27                 them to identify himself with a New York drivers license,

28         d.      Plaintiff volunteered that his girl friend had just *"dumped him"* and that he

1   was a *"little agitated"* because of that fact;

2   e.   The officers asked no clarifying questions whatsoever and did not check-out

3        plaintiff's explanation of his presence because *"criminals will lie to officers"*;

4   f.   Accordingly, there was no reasonable suspicion to believe that plaintiff had

5        committed, was committing or was about to commit a crime;

6   g.   Additionally, there was no articulable suspicion that plaintiff was armed and

7        *"it wasn't a threatening confrontation"*;

8   h.   Plaintiff was not advised that he did not have to talk to the officers or submit

9        to a search of his property and that he was free to leave;

10  i.   Nevertheless, the officers searched plaintiff and subjected him to testing for

11       being under the influence of drugs. (Van Blaricom Affidavit, ¶ 6.)

12      In Mr. Blaricom's professional opinion there was not probable cause to arrest

13  plaintiff.  In reaching that conclusion he considered the following facts:

14      a.  Since there was not even reasonable suspicion to detain plaintiff, as

15          previously described herein, the greater standard of probable cause to arrest

16          was clearly absent;

17      b.  The officers relied upon a "Drug Abuse Recognition Program (DAR) 7-Step

18          Process" but they failed to apply the first three steps of that process:

19          1)  The first two steps require that horizontal and vertical gaze nystagmus

20              tests be administered,

21          2)  Neither officer is certified to give those tests;

22      c.  According to both officers, they summarily decided that plaintiff was under the

23          influence of a stimulant and them gave only those tests that would support that

24          conclusion, rather than complete the whole battery of tests to reach a fully

25          informed opinion;

26      d.  Although officers can be specially trained and certified as Drug Recognition

27          Experts (DRE), for purposes of establishing probable cause, neither of these

28          officers had received that training and certification (incidentally, even trained

and certified DRE officers may be mistaken in their evaluations of drug abuse suspects twenty-one percent of the time);

e.   At the time of plaintiff's arrest, the critical observations by Rodriguez and Perry were inconsistent with each other but those inconsistencies were never discussed between the FTO and his trainee, who was making only his second such arrest;

f.   After another *"approximately twenty minutes"*, under different lighting conditions, their further observations were completely inconsistent with those upon which they had relied to arrest plaintiff;

g.   It should be noted that, at the time of his deposition, Officer Rodriguez was under investigation for another allegation of false arrest. (Van Blaricom Affidavit, ¶ 7.)

In Mr. Van Blaricom's professional opinion the processing of plaintiff as a drug suspect was more probably than not a training exercise.  In reaching that conclusion he considered the following factors:

a.   Rodriguez was a rookie in training and Perry was his Field Training Officer (FTO);

b.   Perry was directing Rodriguez' contact with plaintiff as part of his training and was concerned with his trainee's failure to *"see things through"*. (Van Blaricom Affidavit, ¶ 5.)

## III.   ARGUMENT.

### A. Summary Judgment Standards.

Summary judgment is only appropriate where the evidence is "so one-sided that one party must prevail as a matter of law." *(Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2205 (1986).) "Because summary judgment is a drastic remedy and deprives a party of the right to a jury trial, strict standards apply." (Schwarzer, Tashima & Wagstaffe, CA. PRAC. GUIDE: FED CIV. PRO. BEFORE TRIAL (The Rutter Group

1   2000) § 14:31, p. 14-10.)

2          It is the moving party's burden to establish that there is "no genuine issue of

3   material fact and that the moving party is entitled to judgment as a matter of law." (FRCP

4   56(c); *British Airways Board v. Boeing Co.* 585 F.2d 946, 951 (9th Cir. 1978).) Because

5   summary judgment is a "drastic device," cutting off a party's right to present his or her

6   case to the jury, the moving party bears a "heavy burden" of demonstrating the absence

7   of any material issues of fact. (*Nationwide Life Insurance Company v. Bankers Leasing

8   Association, Inc.* 182 F.3d 157, 160 (2nd Cir. 1999) The moving party's burden is to show

9   the district court that there is an absence of essential evidence to support the opposing

10  party's case. (*Celotex Corp. v. Catrett* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986).)

11  As the high court stated "It is not enough to move for summary judgment ... with a

12  conclusionary assertion that the [opposing party] has no evidence to prove his case."

13  (*Celotex, supra*, 477 U.S. at p. 326, 106 S.Ct. at 2555 (J. White, concurring opinion).

14  The inferences drawn from the evidence must be viewed in the light most favorable to

15  the nonmoving party. (*Eastman Kodak Co. v. Image Technical Services, Inc.* 504 U.S.

16  451, 456, 112 S.Ct. 2072, 2077 (1992).)

17         Where, as here, the standard of proof at trial is a preponderance of the evidence

18  standard, the opposing party's evidence need only be such that "a fair-minded jury could

19  return a verdict for the [opposing party] on the evidence presented." (*Anderson v. Liberty

20  Lobby, Inc.* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512 (1986).)  "The judge hearing a

21  motion for summary judgment may not 'weigh' the evidence or determine its credibility.

22  (That is a jury function.) Rather, as *Liberty Lobby* makes clear, the judge's function is

23  only to determine whether the opposing party's evidence—*accepting it as true and

24  resolving all disputes in its favor*—is sufficient to satisfy the standard of proof established

25  by substantive law." ((Schwarzer, Tashima & Wagstaffe, CA. PRAC. GUIDE: FED CIV.

26  PRO. BEFORE TRIAL (The Rutter Group 2000) § 14:158.1, p. 14-42.) If there is any

27  dispute as to the underlying historical facts, summary judgment cannot be granted. If the

28  ultimate issue before the court is predominantly factual it is more appropriately decided

1  by a jury. (Schwarzer, Tashima & Wagstaffe, CA. PRAC. GUIDE: FED CIV. PRO.

2  BEFORE TRIAL (The Rutter Group 2000) § 14:224, p. 14-61; see also Schwarzer, Hirsh

3  & Barrans, *"The Analysis and Decision of Summary Judgment Motions"* 139 FRD 441

4  (1992).) Where the inference to be drawn requires "experience with the mainsprings of

5  human conduct" and "reference to the data of practical human experience." the jury must

6  make the determination. Summary judgment is improper. *(Nunez v. Superior Oil Co.* 572

7  F.2d 1119, 1126 (5th Cir. 1978).) One "ultimate fact" for a jury to determine, and that

8  therefore cannot be resolved on summary judgment, is whether a party acted with "due

9  care." (*Bryant v. Hall* 238 F.2d 783, 787 (5th Cir. 1956).)

10      Rule 56 does not permit trial by affidavits. The court's function on a motion for

11  summary judgment is issue-finding, not issue -resolution. (*United States v. One

12  Tintoretto Painting* 691 F.2d 603, 606. (2nd Cir. 1982).) The court must view the evidence

13  presented on the motion in the light most favorable to the opposing party. As the high

14  court stated in *Anderson, supra,* 477 U.S. at 255, 106 S.Ct. at 2513, "The evidence of

15  the non-movant is to be believed, and all justifiable inferences are to be drawn in his

16  favor." Summary judgment in tort cases is rare because issues of "negligence," "due

17  care" and "proximate causation" usually require jury resolution of competing inferences.

18  (*Westfall v. Erwin* 484 U.S. 292, 108 S.Ct. 580 (1988).)

19

20      **B.  There Are Triable Issues As to Whether the Officer's Violated Plaintiff's
           Constitutional Rights.**

21

22      An action under 29 U.S.C. § 1983 must prove that the defendant, acting under

23  color of state law deprived the plaintiff of a right secured by the Constitution of the United

24  States. Here, there are triable issues as to whether defendants violated plaintiffs' rights

25  under the Fourth and Fourteenth Amendments of the United States Constitution.

26

27

28

1

**1. There are triable issues of fact as to whether the officers had reasonable suspicion to justify detaining Plaintiff and/or probable cause to arrest Plaintiff.**

2

3       An action for false arrest or detention may be brought under section 1983 for

4   violations of the Fourth and Fourteenth Amendments. (see, *e.g., Monroe v. Pape,* 365

5   U.S. 167, 81 S.Ct. 473 (1961); *Washington v. Lambert,* 98 F.3d 1181 (9th Cir. 1996).

6   Here, there are triable issues of fact as to whether the officers had sufficient reasonable

7   suspicion of criminal activity to justify detaining plaintiff to test him for being under the

8   influence of a controlled substance.  It is even more clear that there are triable issues of

9   fact as to whether the officers had probable cause to arrest plaintiff.

10

11              **a.      Reasonable suspicion.**

12      As defendants correctly state, an officer may detain someone where the officer

13  has a reasonable suspicion that criminal activity may be afoot and the person being

14  detained is connected with that possible criminal activity, and the determination of a

15  reasonable suspicion must be made in the context of the "totality of circumstances" for

16  determining the presence of a "particular and objective basis" for the officer's suspicions.

17  (*United States v. Arvizu,* 534 U.S. 266, 273-274 (2002); *United States v. Tiong*, 224 F.3d

18  1136, 1139 (9th Cir. 2000).)  However, plaintiff strongly disagrees with defendants'

19  contention that there is no triable issues of fact as to whether the officers had reasonable

20  suspicion to detain plaintiff to "test" him for being under the influence of a controlled

21  substance.

22      As discussed above, it the opinion of a police practices expert with 29 years of

23  police experience, including 11 as a Chief of Police, that under the totality of the

24  circumstances, the officers did not have sufficient reasonable suspicion to detain

25  plaintiff.  He bases this opinion on the facts that Plaintiff was standing on a well lighted

26  corner waiting for a ride; Plaintiff was observed to be wearing a t-shirt and *"flailing his*

27  *arms"* on an *"extremely cold"* night; Plaintiff made no effort to elude the officers and

28  voluntarily approached them to identify himself with a New York drivers license, Plaintiff

volunteered that his girl friend had just *"dumped him"* and that he was a *"little agitated"* because of that fact; and the officers asked no clarifying questions whatsoever and did not check-out plaintiff's explanation of his presence because *"criminals will lie to officers."*

It is worth noting that defendants distort the officer's own observations to support their argument.  For instance, they rely on factors such as plaintiff perspiring and his body temperature being too high without noting that Officer's Rodriguez's observations were that plaintiff was "slightly sweating" and that plaintiff's body temperature was "slightly higher" then his own.  More importantly, defendants fail to address at all the critical and undisputable fact that the officers failed to ask any clarifying questions whatsoever and did not check-out plaintiff's explanation of his presence (which would have explained each of the factors they cite in claiming to have had reasonable suspicion of criminal activity).  Rodriguez's explanation that they did not do so because *"criminals will lie to officers"* is strong evidence that the officers simply assumed that plaintiff was a criminal and acted accordingly. In addition, plaintiff disputes that he was displaying "erratic" behavior or that his speech was "fluctuating."  Thus, there are triable issues of fact as to whether the officers had reasonable suspicion of criminal activity sufficient to justify detaining plaintiff.

### b.    Probable Cause.

An arrest can only be made upon probable cause which, as the Supreme Court said in *Beck v. Ohio,* 379 U.S.89, 91, 85 S.Ct. 223, ___, depends "upon whether, at the moment the arrest was made, ... the facts and circumstances within [the officer's] knowledge and which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." The good faith of the arresting officer will not validate an otherwise unconstitutional arrest. (*Caballero v. City of Concord*, 956 F.2d 204, 206 (9th Cir. 1992).)

There is substantial authority that in section 1983 cases probable cause should be submitted to the jury. (see *e.g.*, *Montgomery v. DeSimone,* 159 F.3d 120, 125-126 (3d Cir. 1998). The Ninth Circuit stated in *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th

Cir. 1984) that "In a § 1983 action the factual matters underlying the judgment of

reasonableness generally mean that probable cause is a question for the jury." Here

there are abundant factual matters regarding the reasonableness of the officers'

conclusion that they had probable cause to arrest plaintiff.  As detailed above, it the

opinion of a police practices expert with 29 years of police experience, including 11 as a

Chief of Police, that the officer's conclusion that they had probable cause to arrest

plaintiff was not reasonable.  He bases that conclusion on the facts that: since there was

not even reasonable suspicion to detain plaintiff (see above), the greater standard of

probable cause to arrest was clearly absent; the officers relied upon the DAR 7-Step

Process but they failed to apply the first three steps of that process and were not

certified to do so; they summarily decided that plaintiff was under the influence of a

stimulant and them gave only those tests that would support that conclusion, rather than

complete the whole battery of tests to reach a fully informed opinion; they were not

trained and certified as Drug Recognition Experts (DRE);at the time of plaintiff's arrest,

the critical observations by Rodriguez and Perry were inconsistent with each other but

those inconsistencies were never discussed between the FTO and his trainee, who was

making only his second such arrest; and that after another *"approximately twenty*

*minutes"*, under different lighting conditions, their further observations were completely

inconsistent with those upon which they had relied to arrest plaintiff (he also noted that

Officer Rodriguez was under investigation for another allegation of false arrest).

Furthermore, even if an officer has information supporting the conclusion that

there is probable cause to arrest, he has a duty to investigate other information that

might tend to demonstrate the innocence of the suspect. In *BeVier v. Hucal,* 806 F.2d

123, 128 (7th Cir. 1986) the court held that the officer should have made a further inquiry

of available witnesses at the time of arrest. In *Sevigny v. Dicksey*, 846 F.2d 953, 957 (4th

Cir. 1988) the court provided further analysis to support the conclusion that some

investigation may be required before an arrest can be made, depending upon the

circumstances. The court reasoned that because an objective test is to be used to

1   determine whether there is probable cause for an arrest, the calculation should be made

2   not on the basis of the subjective perceptions of the officer but on the situation "as a

3   police officer acting reasonably under the circumstances should have perceived it." In

4   *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) the court held that an officer may not

5   ignore exculpatory evidence and is required to conduct a reasonably thorough

6   investigation.       Here the officers should have—and admittedly didn't—make further

7   inquiries about what plaintiff was doing at the corner at that time, why he was not

8   wearing heavier clothes in the cold, and whether he was telling the truth about breaking

9   up with his girlfriend.  They failed to do so, apparently because they simply assumed that

10  plaintiff was a criminal who would lie to them.

11      None of the California cases cited by defendants in support of the proposition that

12  the officers had probable cause to arrest as a matter of law are applicable to the instant

13  case. None of these cases involved civil liability under § 1983. Unlike here, each of those

14  cases were criminal cases in which the court was charged with the task of weighing the

15  facts in making a determination as to whether probable cause existed. Further none of

16  these cases involved the question of whether the officer's had conducted a reasonable

17  investigation or had ignored exculpatory evidence.

18      As discussed above, defendants completely disregard the critical fact that the

19  officers failed to ask plaintiff any clarifying questions and instead apparently simply

20  assumed that plaintiff was lying to them because he was a criminal.  They also disregard

21  the officers failure to follow the D.A.R. 7-Step process that they were supposedly relying

22  on, as well as the inconsistencies in the officer's findings.  In fact, they make the rather

23  remarkable statement that Perry's "findings at the scene confirm those of Rodriguez"

24  (Def's Memorandum, p. 18, ll. 7-8) when in fact the two officers findings were widely

25  variant from each other, as well changing significantly in just 20 minutes time.

26  Defendants rely heavily on Perry's training and experience, yet Perry admits that he

27  allowed his trainee, Rodriguez, decide whether to arrest plaintiff, despite the

28  inconsistencies in their findings, which were never discussed between the officers.  In

addition, as discussed above, plaintiff disputes that he was displaying "erratic" behavior or that his speech was "fluctuating."  He also disputes defendants' assertion that he exhibited an inability to understand and follow simple instructions and directions. There is clearly more than sufficient evidence to raise a triable issue of fact as to whether the officers had probable cause to arrest plaintiff.

**2.    There are triable issues as to whether the officers used excessive force in handcuffing plaintiff.**

Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances. *(Graham v. Connor*, 490 U.S. 386, 397 (1989).) Determining whether force used in making an arrest is excessive or reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  "A series of Ninth Circuit cases has held that tight handcuffing can constitute excessive force ... The issue of tight handcuffing is usually fact specific and is likely to turn on the credibility of the witnesses." ." (*Lalonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000).)

Here, Plaintiff alleges that he repeatedly complained that the handcuffs were too tight and requested that they be loosened.  The officer's admit that plaintiff complained about the handcuffs being too tight.  They also assert that they saw plaintiff repeatedly pulling on the handcuff when he was handcuffed to the hospital bed, but neither officer did anything to attempt to stop him from doing so.  The question of whether the officers used excessive force in handcuffing plaintiff is a question of fact for the jury to determine.

**C.  There Are Triable Issues of Fact as to Whether the Officers Are Entitled to Qualified Immunity.**

Defendants ignore a plethora of authority that show that the officer's are not entitled to qualified immunity as a matter of law. Qualified immunity is a question for the

1   jury where the issue is whether a reasonable officer would have thought the defendant

2   had committed a crime. (*Mahoney v. Kesery*, 976 F.2d 1054 (7th Cir. 1992).) Only an

3   officer's objective good faith belief that he did not violate the Fourth Amendment entitles

4   him to qualified immunity. (*Morgan v. Woessner*, 997 F.2d 1244, 1260 (9th Cir. 1993)

5        The Ninth Circuit has recently addressed the issue of qualified immunity in

6   several fourth amendment cases. In *Lalonde v. County of Riverside*, *supra,* 204 F.3d at

7   p. 953 the court stated "The determination of whether a reasonable officer could have

8   believed his conduct was lawful is a determination of law that can be decided on

9   summary judgment only if the material facts are undisputed. *Act Up!/Portland v. Bagley*,

10   988 F.2d 868, 873 (9th Cir. 1993) If, however, there is a material dispute as to the facts

11   regarding what the officer or the plaintiff actually did, the case must proceed to trial." In

12   *Robinson v. Solano County,* 218 F.3d 1030, 1037 (9th Cir. 2000) the court reversed

13   determination that officers were protected from liability for excessive use of force where

14   material issues of facts existed as to whether an objectively reasonable officer could

15   have believed the amount of force was lawful. In *Katz v. United States,* 194 F.3d 962,

16   969 (1999) summary judgment on grounds of qualified immunity was reversed where

17   genuine material issues of fact existed regarding plaintiff's fourth amendment claim.

18   Finally, in *Headwaters Forest Defense v. County of Humboldt,* 211 F.3d 1121, 1141 (9th

19   Cir. 2000), the court stated that in a civil rights action in which qualified immunity is

20   asserted, the reasonableness of the officer's conduct comes into play both "as an

21   element of the officer's defense and "as an element of the plaintiff's case. ... Where

22   essential historical facts concerning what an official knew or did are in dispute, "it is clear

23   that these are questions of fact for the jury to

24        Here, there are factual disputes over the question of whether plaintiff's behavior

25   was "erratic" and his speech "fluctuating," as well as whether he failed to follow

26   Rodriguez's directions.  For that reason alone, the officers are not entitled to qualified

27   immunity for plaintiff's reasonable suspicion and probable cause claims.

28        Furthermore, in *Kuehl v. Burrtis*, *supra,* 173 F.3d at p. 650 the court held that

1   there was no qualified immunity where, like here, the officer concluded there was

2   probable cause and ignored potentially exculpatory evidence. Similarly, there is no

3   qualified immunity where an objectively reasonable officer would have conducted a

4   further investigation at the scene which would have confirmed the plaintiff's version of

5   the incident. (*Sevigny v. Dicksey*, *supra,* 846 F.2d 953; see also *Tillman v. Coley* 886

6   F.2d 317 (11th Cir. 1989); no qualified immunity where sheriff arrested a person with the

7   same name as that on the arrest warrant but who was twenty years older than the

8   person described on the warrant and *Fields v. City of Omaha,* 810 F.2d 830, 835 (8th Cir.

9   1987); Officer lacked reasonable suspicion for initial detention, so could not claim

10  qualified immunity "because he failed to follow clearly established constitutional law of

11  which he should have known.")

12      It is the plaintiff's burden to proves the rights in question were clearly established

13  at the time of the conduct in issue (*Davis v. Scherer*, 468 U.S. 183, 104 S.Ct 3012

14  (1984).)  However, there is no question that the constitutional rights that plaintiffs assert

15  (i.e., warrant less arrest without probable cause, unreasonable detention, and excessive

16  force), were well established at the time of the incident.  Once that burden has been met

17  It is the officers who "must prove that their conduct was reasonable even though it might

18  have violated constitutional standards."  (*Ramero v. Kitsap County* 931 F.2d 624, 627 (9th

19  Cir. 1991).)  Here, as discussed above, Mr. Van Blaricom's affidavit shows that there are

20  triable issues of fact as to whether the officer's conclusions that they had "reasonable"

21  suspicion to detain plaintiff as well as whether they reasonably believed that they had

22  probable cause to arrest plaintiff.  Therefore, they are clearly not entitled to have these

23  claims summarily adjudicated on the grounds that they are entitled to qualified immunity.

24      As to plaintiff's excessive force claim, the Ninth Circuit has held that the test for

25  qualified immunity in excessive force cases is the same as the test on the merits. (*Katz

26  v. United States*, 194 F.3d 962, 968 (9th Cir. 1999).)  Since, as discussed above, there is

27  ample evidence that the officers used excessive force, it is clear that they are not

28  protected from this claim by qualified immunity.

1

2

### D.  There Are Triable Issues of Fact as to Whether the City is Liable Pursuant to Monell.

3

4      Defendant City of Santa Cruz claims it is immune from liability from plaintiffs §

5    1983 claims because there is no evidence that the officers were acting pursuant to an

6    official custom or policy of the City of Santa Cruz. Not so.  Perry testified that it is the

7    policy of the City not to have drug recognition experts available to examine under the

8    influence suspects in the field.[6]  Given the fact that even trained and certified drug

9    recognition experts may be mistaken in their evaluations of drug abuse suspects 21% of

10   the time (Van Blaricom Affidavit, ¶ 7.d.), combined with the failure of the officers to follow

11   the D.A.R. 7-step program, and the wildly inconsistent findings of the tests that they did

12   do, a reasonable trier of fact could find that this policy caused plaintiff's unconstitutional

arrest without probably .

13

14            ### E.  There Are Triable Issues As to Plaintiff's State Law Claims.

15         As the Ninth Circuit recently confirmed, state law avenues for relief are

16   substantially broader than those available under the federal constitution. (*Moreland v.*

17   *Las Vegas Police,* 159  F.3d. 365, 373 (9th Cir 1998).) There are triable issues of fact that

18   must be submitted to the jury as to all of plaintiffs' state law claims. Defendants support

19   their claim that they are immune from liability on plaintiff's state law claims based on the

20   same facts that support their denial of liability on plaintiff's constitutional claims. That this

21   is a house of cards easily collapsed is amply demonstrated above. Defendants are not

22   immune from liability for plaintiff's false imprisonment claim pursuant to Penal Code

23   sections 847 and 815.2(b) because there are triable issues as to whether the seizure of

24   plaintiff was reasonable. Similarly,  defendants are liable for battery because the officers

25   intentionally caused a harmful and offensive touching without proper cause. (*Boyes v.*

26   *Evans* 14 Cal.App. 2d. 472, 479. (1936).)  As discussed above, there are triable issues

27

28

---

[6]
       The arresting officer is competent to testify regarding the official policies of the
       departm ent.  *Lalonde v. County of Riverside, supra,* 204 F.3d at pp. 961-962.

1   as to whether the force they used (or any force) was reasonable.

2       As to plaintiffs' infliction of emotion distress claims, since there are triable issues

3   as to whether the detention and arrest of plaintiff was lawful, there is no merit to

4   defendants assertion that these claims fail because the arrest was lawful. As to the

5   intentional infliction cause of action, California court's have held that an involuntary

6   detention or confinement can constitute conduct sufficiently outrageous to support this

7   cause of action. (*Iverson v. Atlas Pacific Engineering*, 143 Cal.App.3d 219, 222 (1983).

8   Whether defendants' conduct towards both plaintiff was sufficiently outrageous, and

9   plaintiff's emotional distress was sufficiently severe are both triable issues of fact for the

10  jury to decide.

11                          **CONCLUSION**

12      For all of the above reasons, and in the interests of justice, defendants motion for

13  summary judgment must be denied in its entirety.

14  Dated: March 1, 2004              LAW OFFICE OF DOUGLAS KANE

15

16                                  /s/
                    By: _____
17                         DOUGLAS C. KANE
                         Attorneys for Plaintiff
18

19

20

21

22

23

24

25

26

27

28

1

**PROOF OF SERVICE**

2       I am a resident of or employed in the County of Santa Cruz, State of California.  I

3   am over the age of 18 and not a party to the within action; my business address is 121

4   Jewell Street, Santa Cruz, CA 95060.

5       On this date I served the foregoing document described as **PLAINTIFF'S**

6   **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**

7   **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE,**

8   **FOR SUMMARY ADJUDICATION; DECLARATION OF PLAINTIFF KEVIN HALPERN**

9   **IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN**

10  **THE ALTERNATIVE, FOR SUMMARY ADJUDICATION; DECLARATION OF**

11  **DOUGLAS C. KANE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY**

12  **JUDGMENT OR IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION**;

13  **AFFIDAVIT OF D.P. VAN BLARICOM**

14  on the interested parties in this action by placing a true copy thereof enclosed in a

15  sealed envelope addressed as follows:

16  George Kovacevich, Esq.
    Atchison, Barisone & Condotti
17  333 Church Street
    Santa Cruz, CA 95060

18

19      I delivered such envelope by hand this date to a receptionist or other person

20  having charge of the office of the addressee.

21      I declare under penalty of perjury under the laws of the State of California and the

22  United States of America that the foregoing is true and correct.

23      Executed on March 1, 2004, at Santa Cruz, California.

24

25                              /s/

26                      _____
                        Douglas C. Kane

27

28

---